UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | | |
|---|---|---|
| VICTOR ELIAS PHOTOGRAPHY, LLC., | § | |
| An Oregon Limited Liability Company, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CA. No. 0:19-cv-62173 |
| | § | |
| ICE PORTAL, INC., | § | |
| A Florida Corporation, and | § | **PLAINTIFF'S MEMORANDUM** |
| SHIJI (US), INC., | § | **IN OPPOSITION OF** |
| a Delaware Corporation, | § | **DEFENDANTS' MOTION** |
| | § | **FOR SUMMARY JUDGMENT** |
| Defendants. | § | |

Plaintiff, Victor Elias Photography, LLC ("Elias" or "Plaintiff"), files this memorandum

in opposition to Defendants' Motion for Summary Judgment [ECF No. 39] by Defendants, ICE

Portal, Inc. ("ICE") and Shiji (US), Inc. ("Shiji") (collectively, "Defendants"), and in support

shows:

# Table of Contents

I.   Counter Statement of Undisputed Facts ............................................................... 1

   a.   Elias' Business and Proprietary Copyrighted Images .................................... 1

   b.   ICE's Intentional Removal of Elias' CMI and Distribution of Elias Images without

   CMI ........................................................................................................................ 3

   c.   Defendants were Not Authorized to Remove Elias' CMI ............................... 5

   d.   Defendants' Acts Resulted in Infringement of Elias Images ........................ 6

II.   Summary Judgment Standard ............................................................................. 6

III.   Argument ............................................................................................................ 7

   a.   ICE Had Knowledge – or Reasonable Grounds to Know – that Removing CMI,

   Providing False CMI, and/or Distribution of Images Would Induce Enable, Facilitate, or

   Conceal Infringement ............................................................................................ 9

   b.   ICE's Removal of Elias CMI was Intentional ............................................. 15

   c.   Elias Did Not Authorize ICE to Remove CMI, to Provide False CMI, nor to

   Distribute the Images without CMI or with False CMI ....................................... 18

IV.   Conclusion ....................................................................................................... 20

## I.      Counter Statement of Undisputed Facts

### a.   Elias' Business and Proprietary Copyrighted Images

Between the years 2013 and 2017, Elias was contracted by several individual hoteliers ("Contracted Hoteliers") – operated by three (3) major hotel brands, Starwood, Wyndham, and Marriot ("Hotel Brands") – to create hundreds of rich and captivating photographs of hotels and resorts around the United States, Mexico, and the Caribbean. See Plaintiff's Counter Statement of Material Facts ("CSMF"), ¶ 79. Elias granted the Contracted Hoteliers limited, non-exclusive licenses to use the Elias Images in their advertising and/or marketing efforts on the hotel websites ("Hotel Websites"), as well as on the websites of online travel agencies ("OTAs"), such as expedia.com, tripadvisor.com, bookit.com, and skyscanner.net. CSMF ¶ 80. However, the licenses were clear that Elias remained the sole owner of the copyrights in the Images, that all rights not specifically granted in writing, including copyright, remain the exclusive property of Elias, and that the credit line must read "Victor Elias Photography."[1] CSMF ¶ 81.  The 220 photographs that form the subject matter of this case (the "Elias Images"), 184 of the photographs depict various Starwood properties ("Starwood Images"), 26 of the photographs depict Marriot properties ("Marriot Images"), and 10 of the photographs depict Wyndham's Grand Rio Mar Beach Resort & Spa property ("Wyndham Images"). CSMF ¶ 82.

All of the Elias Images at issue in this case prominently displayed Elias' copyright management information ("CMI") in the embedded metadata or "extended attributes"[2] of the

---

[1] Defendants submitted two (2) exemplar licenses granted to a single hotel property (Sheraton Ambassador Monterrey) that were signed in March and August of 2017 – thus after Marriott acquired Starwood – that allowed publication without credit to Victor Elias Photography. However, the original licenses for the photographs at issue to Sheraton Ambassador Monterrey dated December 14, 2015 – while Starwood owned the property, and while ICE distributed the Images –*did* specially require Sheraton Ambassador Monterrey and all subsequent users to credit "Victor Elias Photography." See Defs' Exhibit 13 [ECF No. 40-13].

[2] "Extended attributes" is Defendants' term of art. This memorandum uses "embedded metadata" and "extended attributes" interchangeably.

Images, showing "Victor Elias" as the creator, "Owner/Photographer," as well as providing notice that the Images are copyright protected (i.e. "©Victor Elias"). CSMF ¶ 83. When Elias provided the Elias Images to the Contracted Hoteliers, Elias' CMI was included in the extended attributes of the Images. CSMF ¶ 84. While Elias did authorize the use of the Elias Images on third-party websites, including the Hotel Websites and/or the OTA's websites, Elias never authorized the removal of its CMI from the extended attributes. CSMF ¶ 85. In fact, Elias specifically required the Contracted Hoteliers and all other uses to ensure the Images were displayed with credit to "Victor Elias Photography." CSMF ¶ 81. As they were displayed by the Contracted Hoteliers and/or Hotel Brands on the various Hotel Websites, all 220 of the Elias Images likewise included Elias' CMI in the extend attributes. CSMF ¶ 87. Elias includes its CMI in the extended attributes of the Elias Images to ensure that anyone who views the Images understands that Elias owns all right and title. CSMF ¶ 88. The extended attributes of a photograph can easily be viewed by right-clicking the photograph, and then clicking on "Properties." CSMF ¶ 88. A large portion of Elias' business depends on word-of-mouth work referrals received from individuals and entities viewing its copyright-protected photographs which appear in magazines and/or other publications (including but not limited to online publications) which identify Elias as the creator of the work. CSMF ¶ 89. When, for example, a travel magazine lawfully uses an image from a source that retains Elias' CMI in the metadata (such as from the Hotel Websites), the magazine extracts such information and credits Elias in the caption of the published photograph. CSMF ¶ 89. Potential customers can then identify Elias as the author of said photograph and contact Elias for its services. Elias also includes the CMI in the extended attributes of the Images to enable Elias to search for and identify all uses of the Images on the Web to determine where photographs are being displayed and/or where copyright violations might exist. CSMF ¶ 89.

**b.  ICE's Intentional Removal of Elias' CMI and Distribution of Elias Images without CMI**

In September of 2016, Elias discovered that some of the Elias Images that were displayed on OTA's websites falsely credited "Tingo" as the author/owner of the Work. CSMF ¶ 90. Upon further investigation, Elias discovered that none of the 220 Elias Images retained Elias' CMI as displayed on the OTA's websites. CSMF ¶ 90. Thereafter, Elias began finding dozens of instances of copyright theft of the Images throughout the World Wide Web. CSMF ¶ 114.[3] However, as they were displayed by the Contracted Hoteliers and/or Hotel Brands on the various Hotel Websites, all 220 of the Elias Images included Elias' CMI in the extend attributes. CSMF ¶ 87. Elias further learned from the photography coordinator of Marriott – Starwood's successor by merger – that, the Elias images stored on the Starwood Asset Library ("SAL") contain all the original photo metadata. CSMF ¶ 91.

Both Starwood and Wyndham contracted with Defendant ICE to import, manage, process, and distribute the Elias Images to various OTAs' websites.  Defendants' Statement of Material Facts ("DSMF") ¶¶ 9-11. Defendants admit that "Ice Portal used to connect to the SAL via an application programming interface that downloaded the images into Ice Portal's Amazon Web Services database." CSMF ¶ 92. Due to Defendants' spoliation of relevant evidence,[4] Elias, the Jury, and the Court are prevented from viewing any of the 10 Wyndham Images as they were imported into ICE's system. Nevertheless, it is undisputed that at least three (3) of the Images maintained Elias' CMI when imported from Wyndham to ICE.[5]  CSMF ¶ 94.

---

[3] Such has become known as "dilution;" a diminution of value of the work through unfettered, downstream infringements.

[4] Which is the subject of Elias' Motion for Sanctions. See ECF No. 36.

[5] The spreadsheet produced by Defendants' for these 3 Images shows "**Victor Elias | Owner/Photographer | @Victor Elias | www.victoreliasphotography.com | Created 9/18/2014 | Victor Elias/Victor Elias Photog**" under the "Copyright" column.

Deposition testimony from the instant suit – as well as in testimony from ICE's prior litigation – shows that ICE's proprietary software[6] removes the extended attributes, including Elias' CMI, from the Images. CSMF ¶ 95-98. ICE created several software applications programs to import, process, and distribute photographs within its system. CSMF ¶ 95. ICE refers to these applications as the "Content Converter" and the "Generic Content Import" or "GCI Tool." CSMF ¶ 95. The Content Converter imports the original photographs – such as Elias Images – as they exist in the format maintained by the hoteliers (i.e. including Elias' CMI). CSMF ¶ 96. Once the Copyrighted Works are in ICE's database, ICE uses the GCI Tool to make approximately ten (10) unauthorized copies of the original Work and resize each such copy fit the needs of different OTAs. CSMF ¶ 97. Defendants admit that the GCI Tool removes the extended attributes – including Elias' CMI – during this process. CSMF ¶ 98.

**Defendants have known for at least six (6) years that their GCI Tool removes extended attributes from the copies it creates.** This is because ICE was involved in two (2) separate arbitration proceedings against its competitor, Leonardo Worldwide Corporation, formerly, VFM Leonardo, Inc, ("Leonardo") in 2014 ("2014 Arbitration") and in 2016 ("2016 Arbitration"). CSMF ¶ 99. In the 2014 Arbitration, Joseph McMahon testified that he is aware that information exists in the metadata of photographs, and that it is possible that the GCI Tool erases such information. CSMF ¶ 100. In the 2016 Arbitration, just as Elias does in the instant case, Leonardo alleged that ICE removed CMI from the metadata of photographs imported from Leonardo's database. CSMF ¶ 101. In 2016, ICE's president and CEO, Henry Woodman testified that since May of 2014 – or since Mr. McMahon's deposition in the 2014 Arbitration – ICE "***look[s] for CMI now where we didn't before***." CSMF ¶ 102. During the 2016 Arbitration, when asked directly whether ICE's software applications removed extended attributes from photos ICE

---

[6] Developed in-house by ICE.

receives, Mr. McMahon testified that "[a]t the time, I knew – I didn't know one way or the other. ***Since then, I have learned that it does***." CSMF ¶ 103.

During his deposition in the instant case, Mr. McMahon testified that Defendants as recently as 2020 – and only upon the request of one of their hotel clients – created a software application that identified CMI in the embedded metadata, and which retains that information during the processing phase of Defendants' service. CSMF ¶ 104. Thus, from the time ICE first discovered that its GCI Tool removed CMI from the extended attributes of photographs in 2014, through 2019, **ICE did nothing to change this aspect of its software application;** instead, it continued to use a software application that it knew was violating the DMCA by removing CMI, and distributing images after removal. CSMF ¶ 105. During this six year period, the removal of CMI from the extended attributes of photographs, and the subsequent distribution of same knowing that CMI was removed was Defendants' *modus operandi*.

### c.   Defendants were Not Authorized to Remove Elias' CMI

Elias made sure that the licenses made with the Contracted Hoteliers were clear that Elias remained the sole owner of the copyrights in the Images and that the credit line must read "Victor Elias Photography." CSMF ¶ 1.  At the time, Elias was not aware that any of the OTA's displayed any of the Elias Images without CMI in the extended attributes, and had no reason to believe that it needed to provide specific terms in the original license agreements to prohibit the removal of its CMI from the extended attributes. CSMF ¶ 111. At no time did Elias ever grant anyone, including Defendants, the authority to remove its CMI from the Elias images, nor to distribute copies of the Images knowing that its CMI had been removed. CSMF ¶ 112. Elias and Defendants never entered into a license agreement – nor any agreement for that matter – either expressed or implied. Id. While ICE entered into the Master Services Agreements ("MSAs") with Starwood and Wyndham, wherein Starwood and Wyndham authorized ICE to use and modify the Images, the MSAs did not

provide any license, permission, or any kind or type of authorization, express or implied, to remove CMI from any images – nor to distribute images knowing CMI had been removed. CSMF ¶ 113.

### d. Defendants' Acts Resulted in Infringement of Elias Images

Because Elias' entire business is dependent on its valued intellectual property and word-of-mouth referrals received from individuals and entities viewing its credited copyright-protected images, when infringers remove CMI from the Elias Images, Elias' business suffers tremendously. CSMF ¶ 89. Moreover, in addition to losing future immediate business, without credit as the copyright owner or proper warning against infringement, the value of Elias' Images is at risk of being diluted by massive and continuous infringement and, eventually, total devaluation. CSMF ¶ 116. This is not a theoretical concern. ICE's *modus operandi* of removing Elias' CMI – and subsequent distribution of the Images knowing that CMI had been removed – has directly resulted in infringement of the Elias Images. CSMF ¶ 114-116. Elias has discovered dozens of examples of infringement of the Images throughout the World Wide Web by third parties unrelated to the parties to this litigation – many of which continue to this day. **Id**. Indeed, Elias continues to find additional instances of infringement of the Elias Images on a weekly basis. **Id.** As a direct result of Defendants' violative acts, Elias has utterly lost the ability to monitor and control its intellectual property to the point of near total dilution. **Id.**

## II.     Summary Judgment Standard

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact on the issue for which summary judgment is sought, such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. See *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); see also *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Wimbush v. Wyeth*, 619 F.3d 632, 638 (6th Cir. 2010); *Ferreri v. City of Strongsville*, 1:10-CV-01014, 2011 WL 114331, at *10 (N.D. Ohio Jan. 13, 2011). Once the moving party has met its burden, Rule 56 (e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); see *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* At 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in its favor. See *Id.* at 255.

### III.    Argument

Since their inception, the United States copyright laws have encouraged progress in the areas of technology and the creative arts. See *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 558, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985). While the emergence of the internet has provided immense opportunities for the dissemination of creative works, it has also created a breeding ground for unauthorized copying and subsequent dilution and devaluation of such works. In 1998, Congress enacted 17 U.S.C. § 1202 as part of the Digital Millennium Copyright Act ("DMCA") with the express aim of bringing copyright laws in line with a digital,

global marketplace. To this end, authors and copyright holders establish protective measures to ensure that viewers of their copyright-protected works receive notice of their authorship and ownership. For photographers, such Victor Elias, including their CMI within the extended attributes of works is one of the most – if not the most – efficient and important measures taken to protect their rights.

Section 1202(a) of the DMCA states that "[n]o person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement – (1) [p]rovide copyright information that is false, or (2) [d]istribute or import for distribution copyright management information that is false." 17. U.S.C. § 1202(a). Section 1202(b) of the DMCA states that "[n]o person shall, without the authority of the copyright owner or the law—1) intentionally remove or alter any copyright management information … or … 3) distribute … copies of works … knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title." 17. U.S.C. § 1202(b). Elias makes claims under both § 1202(a) and § 1202(b).

For Elias' claims under § 1202(a), the evidence shows that all of the Elias Images as displayed on the Hotel Websites properly maintained Elias CMI, crediting "©Victor Elias" in the extended attributes of the Images. CSMF ¶ 87. The evidence further shows that all 184 Starwood Images and 10 Wyndham Images contained Elias' CMI in the extended attributes when imported into ICE's system.  CSMF ¶ 91-94. Not only did Defendants remove Elias' CMI from the Copyrighted Works, but on at least 46 of Images ICE distributed to OTAs' websites, ICE provided the false CMI, "Photo credit: Tingo." CSMF ¶ 106. Additionally – and more egregious – at least

one (1) of the Wyndham Images distributed by ICE to OTAs stated "Provided by ICE Portal."[7]

CSMF ¶ 107.

For Elias' claims under § 1202(b), the evidence shows that since May of 2014, ICE has 1) looked for CMI in the images it receives; 2) known that its GCI Tool erases such CMI; and 3) failed to do change its modus operandi. CSMF ¶ 98-105.

The clear and undisputed facts presented in this case contradict Defendants' erroneous claims.

> **a. ICE Had Knowledge – or Reasonable Grounds to Know – that Removing CMI, Providing False CMI, and/or Distribution of Images Would Induce Enable, Facilitate, or Conceal Infringement**

A plaintiff alleging violations under the section 1202 of the DMCA "must demonstrate that the defendant made copies of plaintiffs' copyrighted material without the copyright management information available to users, knowing, ***or when it should have known***, that this would lead to infringements of plaintiffs' copyrights." *Monotype Imaging, Inc. v. Bitstream, Inc.*, 2005 WL 936882, *8 (N.D.Ill. 2005)*. Ultimately, whether ICE acted with knowledge – or with reasonable grounds to know – concerns the mental state of ICE, and is therefore an issue of fact reserved for the jury. See *UMG Recordings, Inc. v. Disco Azteca Distribs*., 446 F. Supp. 2d 1164, 1177 (E.D. Cal. 2006). In fact though, the evidence presented in this response shows that a jury will probably have no alternative but to find that ICE knew – or at the very least had reasonable grounds to know – that its violative acts would induce, enable, facilitate, or conceal infringement.

Not surprisingly, Defendants argue that this Court should follow the opinion put forward by the Ninth Circuit in *Stevens v. Corelogic, Inc.*, 899 F.3d 666 (9th Cir. 2018). In *Stevens*, the Ninth Circuit affirmed the district court's decision to dismiss the plaintiff's DMCA suit regarding

---

[7] Curiously, Defendants make no argument in their motion against Elias' claims against them for providing and distributing false CMI.

removal of CMI in embedded metadata, finding that no evidence existed to show that the *Stevens* defendant knew or had reason to know that removal of CMI would induce, enable, facilitate, or conceal infringement because the plaintiffs failed to provide "specific evidence" that future infringement by a third party was "likely, albeit not certain, to occur as a result of the removal or alteration of CMI." See *Stevens* at 675. However, several pieces of key evidence exist in the instant suit which distinguish the *Stevens* opinion as inapplicable here.

First, there was no evidence that the *Stevens* defendant had any knowledge of the laws under the Copyright Act or the DMCA – nor of the harmful consequences to copyright owners of the removal of CMI from embedded metadata. Here, it undisputed that this is not the first time ICE has been accused of violating the DMCA for similar acts of removal. In 2016, ICE's only competitor, Leonardo initiated arbitration proceedings against it for removal of CMI from the extended attributes of photographs it imports and distributes. CSMF ¶ 99. At that time, Mr. Woodman testified that since May of 2014 – or since Mr. McMahon's deposition in the 2014 Arbitration – ICE "*look[s] for CMI now where we didn't before*." CSMF ¶ 102. During his deposition in the instant suit, Mr. Woodman also admitted that at the time of the 2016 Arbitration, he was aware of Elias, and of a previous lawsuit brought by Elias against Leonardo for similarly removing CMI from photographs. Although ICE was ultimately prevailed in the 2016 Arbitration,[8] the fact that it litigated precisely the same elements three (3) years before Elias initiated the instant suit shows that Defendants were well aware of the elements of the DMCA, and cognizant of the consequences of removing CMI from embedded metadata. This evidence alone demonstrates that – at the very least – ICE had reasonable grounds to know that removing CMI from the Elias

---

[8] Due to the fact that the Arbitration Panel concluded that Leonardo did not have any copyrights in the underlying works and therefore had no standing to pursue claims for removal under the DMCA. See Defs' Ex. 53, pp. 14-16 (ECF No. 40-53).

Images, providing false CMI, and then distributing such Images would induce, enable, facilitate, and/or conceal infringement.

Additionally, however, the MSAs made with Starwood and Wyndham show that ICE is now – and was at all relevant times – knowledgeable about the laws of copyright, and understood the consequences of unlawfully distributing copyright-protected works without authorization from copyright owners. In a decision issued in August of this year, the Second Circuit declined to follow the Ninth Circuit's opinion in Stevens; instead finding that *evidence that a defendant understands that it is "required to get permission to use photographs" provides sufficient basis for the conclusion that the defendant should have reasonably known that removing or altering CMI – or providing false CMI – would conceal infringement*. See *Mango v. Buzzfeed, Inc*., No. 19-445-cv (2nd Cir., Aug. 13, 2020) (emphasis added).

Here, **the undisputed evidence** shows that ICE knew it was required to receive permission to use the Elias Images, and therefore, at the very least it should have reasonably known that removing or altering CMI – and/or providing false CMI – would induce, enable, facilitate, and/or conceal infringement. The contract into which ICE entered with Starwood in 2009 required Starwood to warrant to ICE that Starwood has the "sole responsibility for the accuracy, quality, *integrity, legality*, reliability, appropriateness, and *intellectual property ownership or right to use* any Starwood Content." CSMF ¶ 108. ICE further agreed that it would not assume responsibility for, nor would it be liable for, any "third party claims arising from or related to ICE's *modification in size or format*, storage or distribution of such Starwood Content," and further required Starwood to **"indemnify and hold ICE harmless"** against any such claims. CSMF ¶ 109.

Similarly, the agreement between ICE and Wyndham required Wyndham to *indemnify ICE* in the event of claims made against it. CSMF ¶ 110.

In the case *Jedson Eng'g, Inc. v. Spirit Constr. Servs.*, 720 F.Supp. 2d 904 (S.D. Ohio 2010), the court found that the defendant's insistence on an indemnification clause to protect itself if there was an issue regarding the rights of copyrighted works is evidence that "creates a genuine issue of material fact as to whether [the defendant] had reasonable grounds to know that the removal of the information would 'induce, enable, facilitate, or conceal an infringement of the federal copyright laws.'" *Jedson*, at 930-31.  ICE's insistence on indemnification agreements from both Starwood and Wyndham demonstrates its sophistication and knowledge, and this alone precludes summary judgment.

Additionally, while the Wyndham and Starwood contracts are nearly identical, because ICE entered the Wyndham MSA in August of 2014 – thus just three (3) months after acknowledging that ICE's GCI Tool removes CMI from the embedded metadata – there is one notable addition that is not present in the Starwood Contract. In the Wyndham MSA, the parties agree that "*[e]ach Party shall at any time, at the other Party's request, provide written proof of the rights and/or licenses specified above, if available in tangible form*." CSMF ¶ 61.  As such, ICE had the right and ability to demand that Wyndham provide Elias' licenses showing that Elias was the sole owner of all rights, title, and interest in the Elias Images, and that credit reading "Victor Elias Photography" was required on all such Images. Despite this provision and ICE's knowledge that it was systematically removing CMI as well as providing false CMI, ICE continued its violative operation on all Images it received from Wyndham, knowing the consequences of its violations.[9]

The language in the Starwood and Wyndham MSAs shows beyond question that ICE was then – and is now – savvy in the nature of the Copyright Act and the DMCA. ICE understands that it is required to get permission to use the photographs it receives, and understands that distribution

---

[9] This matter has not settled primarily because Ice believes that Wyndham will indemnify...

of the Elias Images without Elias' CMI will induce, enable, facilitate, and/or conceal copyright infringement of such Works. Further, by requiring Starwood and Wyndham to indemnify it from any liability or damages, ICE knew that it was then free to continue to use it's the CGI Tool to remove Elias' CMI from the metadata knowingly without suffering the financial consequences.[10]

Further, the *Stevens* opinion is neither applicable nor analogous to those in this case. In *Stevens*, the photographers failed to provide any evidence that CMI in extended attributes was "of any practical significance to the Photographers in policing copyright infringement of their images" or that the defendant's removal of CMI actually resulted in infringement. *Stevens* at 675. Here, Elias easily clears both hurdles. First, a large portion of Elias' business depends on licensed users extracting its CMI from the extended attributes – which can be easily viewed by right-clicking the photograph and clicking on "Properties" – and crediting Elias in the published Image. The evidence also show that Elias does use the extended attributes and/or metadata to police copyright infringement by searching online for keywords such as "Victor Elias." CSMF ¶ 48.

.Second, infringement of the Elias Images due to ICE's removal and distribution is not a theoretical concern as it was in *Stevens*. ICE's *modus operandi* of removing Elias' CMI and subsequent distribution of the Images knowing that CMI had been removed has likely directly resulted in infringement of the Elias Images. CSMF ¶ 114-116. Elias has discovered dozens of specific instances of blatant copyright theft of the Images throughout the World Wide Web – many of which continue to this day and none of which contain Elias' CMI in the extended attributes. **Id**. Indeed, Elias continues to find additional instances of infringement of the Elias Images on a weekly basis. **Id.**

---

[10] Indeed, per their contracts, Marriot (successor by acquisition of Starwood) and Wyndham, are both forced to indemnify ICE, and pay all legal fees.

Defendants argue that the Court should disregard the specific evidence of resulting infringements because Elias does not know exactly how these infringers came to possess the infringing images. First, the DMCA does not require proof of actual copyright infringement. See *Murphy v. Millennium Radio Group LLC*, 2015 U.S. Dist. LEXIS 10719, *14 (D.N.J. Jan. 29, 2015). Moreover, exact knowledge is not required under the 17 U.S.C. § 1202, nor is it required under any court's interpretation – including in the Ninth Circuit in *Stevens*. Instead, the Ninth Circuit clearly held that a plaintiff must only show that infringement is "*likely, albeit not certain, to occur as a result of the removal or alteration of CMI.*" See *Stevens* at 675 (emphasis added). Moreover, the Ninth Circuit has specifically held that "[h]ow [a copyright defendant] came to possess [plaintiff's] photographs – and thus whether it had knowledge that the CMI had been removed – is a fact 'particularly within' [the defendant's] knowledge. It would be unfair to burden [the plaintiff] at the summary judgment state with proving that knowledge with greater specificity." *Friedman v. Live Nation Merch., Inc*., 833 F.3d 1180, 1189 (9th Cir. 2016). Once the Images are published on the Web, there are numerous ways for a third-party to copy, distribute, and disseminate a photograph. However, in this case, because the evidence shows that *all* of the Elias Images as displayed on the Hotel Websites maintained Elias' CMI – while *none* of the Elias Images as displayed on the OTA's websites after distribution from ICE contained CMI – the most probable (or most *likely*) conclusion is that the infringers obtained the Images directly from the OTA's without knowing that Elias was the copyright owner. Therefore, as a direct result of Defendants' violative acts, Elias has completely lost the ability to monitor and control its intellectual property to the point of near total dilution. **Id.**

Finally, the law provides a low threshold for establishing a defendant's mental state. Courts around the country have found that a defendant's act of removal is sufficient evidence to allow a jury to determine its ultimate scienter. In *Agence Fr. Presse v. More*l, 934 F. Supp. 2d 547, 578

14

(S.D.N.Y. 2013) "a jury could infer . . . that adding [false CMI] 'AFP' to the caption would 'induce, enable, facilitate, or conceal' its infringement and the infringements of its subscribers.") In *Boatman v. United States Racquetball Ass'n*, 33 F. Supp. 3d 1264, 1275-1276 (D. Colo. 2014), the court denied defendant's motion for summary judgment after it "inferred that the Defendant was aware that removal, or failure to display, the copyright information would lead to an infringement of Mr. Boatman's copyrights." In *McClatchey v. AP*, 2007 U.S. Dist. LEXIS 17768, *16-17 (W.D. Pa. Mar. 9, 2007), the court found "a reasonable factfinder could conclude that by cropping out the copyright notice, Defendant had the requisite intent to induce, enable, facilitate or conceal infringement." Here, ICE's legal history of disregard for the rights of copyright owners – despite understanding the law and the operation of their software for the past 6 years – shows that a jury will easily find that Defendants knew – or at the very least had reasonable grounds to know – that their violative acts would induce, enable, facilitate, and/or conceal infringement.

### b.  ICE's Removal of Elias CMI was Intentional

In their second contention, ICE argues summary judgment is appropriate because they did not intentionally remove Elias' CMI. Yet again, a determination of ICE's intent concerns the mental state of ICE and is therefore an issue for the jury. See *UMG* at 1177. However, the undisputed evidence shows that since 2014, ICE has not only been looking for CMI in the extended attributes of the photographs it imports, it has been aware that its GCI Tool removes such CMI – and yet it has knowingly and consciously refused to change its GCI Tool to comply with the DMCA.

In *Propet USA, Inc. v. Shugart*, the court found a sufficient evidentiary basis upon which the jury could conclude that the defendant intentionally removed CMI from embedded metadata of photographs based on the following facts: 1) testimony from plaintiff that every digital image delivered contained embedded CMI; 2) that information was embedded automatically by his

digital camera; and 3) that defendant had the "knowledge, expertise, and tools that would allow the removal of such information from digital images." *Propet USA, Inc. v. Shugart*, 2007 U.S. Dist. LEXIS 94635 *12 (W.D. Wash. Dec. 13, 2007).

Here, when Elias provided the Elias Images to the Contracted Hoteliers, Elias' CMI – showing "Victor Elias" as the creator and "© Victor Elias" for the copyright notice – was included in the extended attributes of the Images. CSMF ¶ 83. Additionally, both Starwood and Wynhdam retained Elias' CMI in the extended attributes – pursuant to the license agreements – when they were displayed on the Hotel Websites. CSMF ¶ 87. Starwood also maintained Elias' CMI in the extended attributes in all 184 of the Starwood Images in the SAL. CSMF ¶ 91. Because Defendants admit that ICE imported the images from Starwood into its system by connecting to the SAL "*via an application programming interface that downloaded the images into Ice Portal's Amazon Web Services database,*" the evidence affirmatively shows that Elias' CMI was within the Starwood Images when they were received by ICE.[11] CSMF ¶ 91-92.

For the 10 Wyndham Images, it is undisputed that ICE received at least 3 of the Images from Wyndham with Elias' CMI, and that ICE's CGI Tool systematically removed such CMI during processing. CSMF ¶ 94-98. While Elias and the Court are precluded from viewing any of the 10 Wyndham Images as they were received by ICE from Wyndham, Defendants' knowing destruction of these 10 Wyndham Images after being placed on notice of Elias' claims is telling – and is the subject of Elias' Motion for a Spoliation Sanction. See ECF No. 36. Therefore, the evidence affirmatively shows that Elias' CMI was held within the 3 Wyndham Images when they were received by ICE, and Elias has respectfully requested an adverse inference instruction concerning the remaining 7 Images.

---

[11] In a footnote in their memorandum, Defendants vaguely attempt to challenge the notion that ICE received the Elias Images containing Elias' CMI. However, Defendants completely ignore the evidence that shows the Images maintained the extended attributes in the SAL, and that ICE pulled the Images from the SAL.

Once the Images were imported into ICE's system containing Elias' CMI, ICE's proprietary GCI Tool systematically removed the CMI from the extended attributes of the Images. CSMF ¶ 95-98. ICE's removal is therefore unquestioned. It is further undisputed that ICE is a sophisticated company with the knowledge, expertise, and tools – which were in fact created by ICE itself – that allowed it to remove Elias' CMI from these digital Images.

Moreover, ICE has known for at least six years that its in-house GCI Tool removes extended attributes from the copies it creates. CSMF ¶ 100-104. In May of 2014, Mr. McMahon testified that he was aware that information exists in the embedded metadata and that it was possible that the GCI Tool erases such information. CSMF ¶ 100. Two years later, Mr. McMahon confirmed that since 2014 he has known that ICE's software did in fact remove the embedded metadata. Id. In 2016, ICE's president and CEO testified that since May of 2014 – or since Mr. McMahon's 2014 testimony – ICE "look[s] for CMI now where we didn't before." Id. Tellingly, Mr. Woodman did not testify in 2016 that ICE limited their search for CMI to only photographs taken from Leonardo – as he is conveniently claiming now. Mr. Woodman testified that – in a global sense – "we [i.e. ICE] look for CMI now." Id. ICE's self-serving and conclusory affidavits contradict prior testimony, and, therefore, should not be considered in this instance. Moreover, Mr. Woodman admitted that at the time of the 2016 Arbitration he was aware Elias and that Elias had made claims against Leonardo for similarly removing CMI from photographs. As such, ICE was not just looking for CMI in general, but, since at least 2016, ICE had the wherewithal to specifically look for Elias' CMI. Despite their knowledge the Elias' CMI existed in the embedded metadata and that their proprietary software removed the same, between 2014 and 2019, ICE refused to change their business practices – or *modus operandi*.[12] ICE continued its violative ways

---

[12] Despite clearly having the ability to do so, as demonstrated by their most recent update in 2020.

even after narrowly escaping liability on this very subject in 2016 due to a legal technicality. This begs the question, *why?*

The answer is simple: because Starwood and Wyndham both signed MDA's agreeing to indemnify ICE – meaning ICE has no risk of actually having to pay a potentially large judgment – ICE did not have to care. ICE made a basic, cost-benefit decision to continue its violative ways – knowing that it was against the law– instead of bearing the expense to comply with the DMCA. As such, ICE's acts of removal could only have been intentional.

### c. Elias Did Not Authorize ICE to Remove CMI, to Provide False CMI, nor to Distribute the Images without CMI or with False CMI

First, it must be noted that Defendants make no argument that Elias authorized ICE to provide false CMI under 17 U.S.C. §1202(a). As such, Defendants' motion cannot succeed on this issue. Second, Defendants incorrectly cite the DMCA and the case law supporting it when they claim that Elias must prove that ICE "knew it was not permitted to remove CMI" under 17 §1202(b)(1). This is not in the plain language of the statute, and it is not supported by *Stevens*. Section 1202(b) clearly states that "[n]o person shall, without the authority of the copyright owner or the law—1) intentionally remove or alter any copyright management information." Under this provision, Elias must show that ICE intentionally removed its CMI from the Images and that Elias did not authorize such removal. However, *nothing* in the statute requires a showing that ICE intentionally removed CMI *with actual knowledge* that Elias did not authorize the same.

Here, Elias has already established that ICE's removal was performed intentionally. Moreover, ICE has failed to present any evidence that Elias authorized removal. The Federal Circuit has explained that the "requirement of 'authority' in order to avoid infringement, in its natural meaning, 'refers to a grant of permission.'" *Lexmark Int'l, Inc. v. Impression Prods.*, 2016 U.S. App. LEXIS 2452, *26 (Fed. Cir. Feb. 12, 2016). There can be no question that Elias ever granted Defendants permission to 1) remove its CMI from the Elias Images; 2) provide false CMI;

nor 3) distribute the Images knowing Elias' CMI had been removed and/or the Images contained false CMI. To the contrary, the licenses Elias granted the Contracted Hoteliers and/or Hotel Brands clearly stated that Elias remained the sole owner of the copyrights in the Works, that all rights not specifically granted in writing, including copyright, remain the exclusive property of Elias, and that the *credit line must read "Victor Elias Photography."* CSMF ¶ 81.

Defendants' argue that Elias granted Defendants an implied license to remove the extended attributes by granting "broad licenses to Starwood and Wyndham." Whether express or implied, as an affirmative defense, Defendants bear the burden of establishing a license. *See Bourne v. Walt Disney Co.,* 68 F.3d 621, 631 (2d Cir. 1995); *Grant Heilman Photography, Inc. v. McGraw-Hill Cos.*, 28 F. Supp.3d 399, 407 (E.D. Pa. 2014). To prove that Defendants had license to remove Elias' CMI, and/or distribute the Elias Images without CMI – or with false CMI – to the World Wide Web, Defendants must prove that Elias manifested its acquiescence to the conduct at issue. *See e.g. Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998).

Defendants present no evidence that Elias and Defendants ever entered into a license agreement – nor any agreement for that matter – either expressed or implied. In fact, prior to Elias bringing claims against Defendants, the two parties never once met one another. Because there was never privity between Elias and Defendants, it was impossible for Elias to directly authorize or even manifest its acquiescence to Defendants to remove CMI from the Elias Images – or to distribute the Elias Images knowing CMI had been removed.

While it is true that at the time Elias granted the Contracted Hoteliers these licenses, Elias was not aware that any of the OTA's displayed any of the Elias Images without CMI in the extended attributes, and that therefore, it had no reason to believe that it should provide specific terms in the original license agreements to prohibit the removal of its CMI from the extended attributes. CSMF ¶ 111. However, this does not mean that Elias ***acquiesced*** to removal. Quite the

opposite – and unlike the Stevens plaintiff – Elias specifically required all users (including but not limited to contracted hoteliers, hotel brands, OTA's, and Defendants) to ensure the credit line in the licensed photographs read "Victor Elias Photography." CSMF ¶ 81.

Likewise, any claim by Defendants that they received a license or "authorization" from Starwood or Wyndham bears no weight. While ICE entered the MSAs with Starwood and Wyndham, wherein Starwood and Wyndham authorized ICE to use and modify the Images, the MSAs did not provide any license, permission, or any kind or type of authorization, express or implied, to remove CMI from any images – or to distribute images knowing CMI had been removed. CSMF ¶ 113.

In fact, the Wyndham MAS specifically provides that "*[e]ach Party shall at any time, at the other Party's request, provide written proof of the rights and/or licenses specified above, if available in tangible form*." CSMF ¶ 61. ICE entered this agreement only after it began to "look for CMI," and after it discovered that its GCI Tool removed CMI. However, despite this provision – and despite Defendants' knowledge – ICE continued its business practice of removing and providing false CMI.  Indeed, ICE's failure to do anything to determine if their removal was violating Elias' rights "apart from relying upon the representations" of others, is a determinative factor in showing ICE's reckless disregard for Elias' rights. See e.g. *UMG Recordings*, 446 F.Supp.2d at 1174 (citing one of the plaintiff's factors in determining defendant's reckless disregard for its rights is the admission that "other than relying on the representations of Musical Del Norte that it was an authorized distributor, defendant did not do anything to verify whether the product it received was authorized.").

## IV.   Conclusion

For the foregoing reasons, Elias respectfully requests that the Court deny Defendants' motion for summary judgment.

Respectfully submitted,

LEJUNE LAW FIRM

By:    /s/  Dana A. LeJune
       Dana A. LeJune
       Texas Bar No.: 12188250
       email: dlejune@triallawyers.net
       Scott M. Francis
       Texas Bar No.: 24088795
       Email: scott@triallawyers.net
       1225 North Loop W.
       Suite 825
       Houston, Texas 77008
       713.942.9898 Telephone
       713.942.9899 Facsimile

       LAW OFFICE OF TONY LAWHON

By:    */s/ Anthony M. Lawhon*
       Anthony M. Lawhon, Esq.
       tonylawhon@lawhonlaw.us
       3003 Tamiami Trial North
       Suite 200
       Naples, Florida 34103
       239.325.8956 Phone
       239.236.3300 Facsimile

       Attorneys for Victor Elias Photography,
       LLC

## CERTIFICATE OF SERVICE

The undersigned attorney does hereby certify that a true and correct copy of the foregoing instrument, *Memorandum in Opposition to Defendants' Motion for Summary Judgment,* was served on all counsel of record via electronic mail on November 13, 2020.

       /S/ Dana A. LeJune
       Dana A. LeJune